## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DANBY PRODUCTS, INC.,** | ) | **CIVIL ACTION** |
| **1800 Production Drive** | ) | |
| **Findlay, Ohio 45840** | ) | **NO. _____** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **New Widetech Industries Co., LTD.** | ) | |
| **No. 8F-8, Shin Min St. Chung Ho City** | ) | |
| **Taipei County** | ) | |
| **Taiwan,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT

And now comes the Plaintiff, Danby Products, Inc. ("Danby"), by and through its counsel, Post & Schell, P.C., and files this Complaint against New Widetech Industries Co., Ltd. ("NWT"), and in support thereof avers and relies upon the following:

## I.   THE CASE IN BRIEF

1.      Danby seeks relief in the form of damages against NWT arising out of NWT's years-long production and sale of, by NWT's own admission, hundreds of thousands of defective, dangerous and unworkmanlike dehumidifiers (the "products") throughout the United States.

2.       Beginning in 2009, Danby and NWT entered into an Agreement for Supply of Products (hereinafter, "Agreement"), wherein NWT affirmatively represented that it engaged in the sale and manufacture of Air Conditioners and Dehumidifiers and Danby agreed to be an

23319558v1

exclusive supplier of NWT Air Conditioners and Dehumidifiers.  See the Agreement attached as Exhibit "A."

3.      NWT holds itself out as a quality manufacturer that has been manufacturing dehumidifiers for more than 30 years.  NWT represents that it conducts rigorous testing from the design of the dehumidifier through manufacturing, and onto quality control in order to ensure the safety of its products.

4.       Pursuant to the Agreement, NWT was obligated to produce its Products in accordance with safety certifications from either the Canadian Standards Association (C.S.A.) and/or Underwriters Laboratories (U.L.) for all Products shipped to Danby.

5.      Per the Agreement, NWT appointed Danby to be a model exclusive distributor in the United States for certain dehumidifying products manufactured by NWT.

6.      Beginning in 2009, NWT began shipping various models of Dehumidifiers to Danby for distribution and sale throughout the United States.  In 2009 Danby purchased 31,142 Dehumidifiers from NWT for distribution of NWT's Products within the United States.

7.      From 2009 through 2016, Danby purchased approximately 1 million dehumidifying units from NWT for distribution and sale throughout the United States and Canada.  Danby paid NWT more than $100 million to purchase of these units from NWT to be distributed throughout the United States and Canada.

8.      Danby's last purchase order for NWT dehumidifiers was made on or around June 30, 2016.

9.      Beginning in 2016, Danby began to receive claims from consumers that sustained losses as a result of malfunctioning dehumidifying units that had been purchased from

NWT.  Danby began reporting these occurrences to the United States Consumer Product Safety Commission in July of 2017.

10.     By October of 2017, NWT was involved in the CPSC's investigation into overheating issues and began investigating issues with its dehumidifying units.

11.     In February of 2018, the CPSC closed out its investigation into these matters. NWT represented to Danby that it was continuing a root cause investigation as to the overheating issue reported by some customers.

12.     The issues with NWT's dehumidifiers did not cease with closure of the CPSC's investigation.  In January of 2021, NWT's Counsel conducted a preliminary teleconference with the CPSC, without participation by Danby.   During that telephone call Counsel for NWT apparently disclosed that since the CPSC close-out in 2018, NWT continued to study the incident data for the overheating claims.  It was further communicated that "incidents" did not appear to occur until the dehumidifiers were four (4) to five (5) years old.  Apparently, without any participation from Danby, NWT communicated to the CPSC that it intended to recall any and all dehumidifiers manufactured between 2009[1] and 2016[2].

13.     Over the course of the following months, NWT conferred with the CPSC (and Health Canada), at the exclusion of Danby to institute a recall of nearly 2 million dehumidifying units throughout Canada and the United States.   NWT selected the recall plan, including development of a formula that would be used to determine consumer reimbursement.

---

[1] This was later amended to include those units manufactured in 2009.

[2] NWT advised that in 2016 a design change had been implemented, and through independent engineering testing performed by Tom Bajzek of Engineering Systems, Inc. (ESI), none of the "incidents" were able to be replicated in post-design change models.

14.     Despite repeated requests by Danby for assurances that its costs, expenses and fees related to the recall would be covered by NWT, such requests were ignored (and subsequently rejected).

15.     NWT has rebuffed Danby's attempts to obtain fair and just compensation for NWT's production and sale to Danby of millions of defective products, and NWT's subsequent decisions to institute a recall and recall in such a manner that causes Danby to incur enormous monetary losses and reputational injury.

16.     NWT knowingly instituted a recall while excluding the involvement and interests of its exclusive supplier, Danby, magnifying the uncertainty, costs and damages that Danby would and is incurring in addition to the damages suffered as a result of unknowingly selling to Danby approximately 1 million defective, dangerous and now useless dehumidifiers.

17.     NWT has acknowledged that the Products it made, produced and sold are defective, dangerous and have led to over one hundred (100) reported fire events, rendering the entire stock of products on the market and in consumers' homes to be unsafe, unreliable and *according to NWT*, deserving of recall.

18.     NWT recognizes that its products – sold to Danby as Danby's model exclusive distributor – are not fit for continued use and in fact should not be used ever again.[3]

---

[3] NWT, through conferral with the CPSC, has determined that consumers who wish to be refunded any money must identify the make, model and serial number of the unit, as well as send proof that the power cord has been cut, so as to permanently and indefinitely render the unit inoperable.

## Dehumidifier Recall Summary

2021/07/08

 U.S. Consumer Product Safety Commission — Recall with Health Canada and Mexico

Release Date: August 4, 2021
Release Number: 21-174

Two Million Dehumidifiers With Well-Known Brand Names Recalled Due to Fire and Burn Hazards;
Manufactured by New Widetech

**Recall Summary**

**Name of Product:** Dehumidifiers

**Hazard:** The recalled dehumidifiers can overheat and catch fire, posing fire and burn hazards.

. . .

**Recall Details**

**Units:** About 2 million (In addition, about 380,000 in Canada, and about 25,000 in Mexico)

**Description:** This recall involves 25-, 30-, 35-, 45-, 50-, 60-, 65-, 70-, and 74-pint dehumidifiers with the brand names including AeonAir, Amana, ArcticAire (Danby), Classic (Danby / Home Hardware Stores), Commercial Cool, Danby, Danby Designer, Danby Premiere, De'Longhi, Edgestar, Friedrich, Generations (Danby), Haier, Honeywell (JMATEK / AirTek), Idylis,
Ivation, perfect aire, SuperClima, Whirlpool, and Whynter. The brand name, model number, and pint capacity are printed on the nameplate sticker on the back of the dehumidifier.

See http://www.newwidetech.com/en/news.php?act=view&id=9.

19.     Quite obviously, NWT's production and sale to Danby of defective, dangerous and unfit-for-use products breached its supply agreement with Danby. See Exhibit "A." Inherent (and explicit) in the bargain was that NWT would sell to Danby products that, at a

minimum, met basic standards of workmanship and quality and would not pose a hazard to customers purchasing the dehumidifiers.

20.     Additionally, NWT's production and sale to Danby of defective, dangerous and unfit-for-use products breached the implied warranty of merchantability as set forth under Pennsylvania law at 13 Pa.C.S.A. § 2-314 and the Uniform Commercial Code at 13 Pa.C.S.A. § 1101 *et seq.*

21.     NWT's production and sale to Danby defective, dangerous and unfit-for-use products breach express warranties made to Danby that the dehumidifying units would meet specific safety standards.  <u>See</u> Exhibit "A."

22.     NWT was unjustly enriched by Danby in that Danby paid for nearly 1 million units under the assumption and representation that those units would be workmanlike, free of defects and able to be safely used, at a minimum, and in reality NWT represents and admits its products were actually defective, dangerous, unfit for consumer use and should not be used even a moment longer, and are now worthless and/or have no apparent value as NWT is directing that the units be rendered inoperable and thereafter destroyed. <u>See</u> the CPSC's Safety Notice, acknowledging that NWT was recalling Danby dehumidifiers because they "can overheat and catch fire posing fire and burn hazards," attached as Exhibit "B."

23.     At all times material to Danby and NWT's supply arrangement, NWT was aware and/or was on constructive notice that Danby sold NWT's dehumidifiers primarily through two (2) large retailers, Costco and Menard's.

**Incidents/Injuries:** New Widetech is aware of 107 incidents of the recalled dehumidifiers overheating and/or catching fire, resulting in about $17 million in property damage. No injuries have been reported.

**Sold at:** Lowe's stores, Costco, Walmart, Menards, and other retailers nationwide from February 2009 through August 2017 for between $120 and $430.

**Manufacturer:** New Widetech

**Manufactured in:** China

> See http://www.newwidetech.com/en/news.php?act=view&id=9.

24.     Indeed, NWT profited from Danby's relationships with those large retailers, in that Danby purchased NWT dehumidifiers from NWT in order for those units to make their way into the homes and offices of Costco and Menard's customers.

25.     NWT's sale and production of defective products and thereafter voluntary recall of its fire-prone products knowingly and directly resulted in consumers returning units directly to Coscto and Menard's, with those retailers taking certain adverse actions and offloading real and material costs upon Danby as a result of NWT's defective products and handling of its voluntary recall.

26.     In addition to massive, direct financial losses, NWT's conduct as described herein has interfered with Danby's business relationships with retailers and consumers, and has materially damaged Danby's reputation by virtue of being "tied" in the public eye to NWT's defective, dangerous and unfit-for-use Products, including the potential for increased litigation arising our of product failure and/or losses.

27.     NWT has purposefully and deliberately failed to compensate Danby for the significant losses incurred to date, which include: back-charges and withheld payments from Costco and Menard's; transportation and logistics costs associated with transporting and stowing NWT's defective products; labor and costs associated with following NWT's demand that Danby

comply with the recall like an individual consumer for the thousands of units being sent to Danby[4]; legal fees and expenses concerning the recall, loss of profits, loss of value between the price paid by Danby for NWT's defective products and their actual value of zero dollars; reputational harm; ongoing fees/costs/penalties and adverse actions by Costco and/or Menards.

28.     NWT's actions and activities have resulted in hundreds of thousands of dollars in damages to date, and it is projected that the damages will ultimately total in the millions and even tens of millions of dollars.  To date, NWT has not compensated Danby in any way for its losses, except to "offer" that Danby follow the terms of its recall, and filing a frivolous lawsuit in Taiwan attempting to disclaim responsibility for selling fire-prone Products seeking a Taiwan court interpret the sale agreement in its favor.

29.     NWT seeks to usurp the protections provided to retailers such as Danby who have been harmed as a result of NWT's unfair dealing, breach of contract, and breach of its duties under the Uniform Commercial Code.

30.     NWT previously required Danby to file suit in order to pay Danby's legal fees and expenses stemming from numerous claims of property damages claims arising out of fire events involving its Products.

31.     Danby agreed to purchase products suitable for use by consumers, fit for intended purpose and compliant with industry safety standards including but not limited to the Canadian Standards Association (C.S.A.) or Underwriters Laboratories (U.L.).  It did not agree

---

[4] NWT has commanded that Danby treat each dehumidifier the same way as an individual consumer – provide NWT the unit serial number information, remove the power cord and submit evidence of removal. Practically, Danby is been required to act as though it were in fact thousands of customers necessitating that Danby to create a work unit from scratch devoted to cleaning up NWT's mess and attempting to recover even a fraction of its losses.  This bad faith process compounds the damages suffered by Danby as a result of NWT's decision-making, not the least of which being the sale of defective products to begin with.  NWT has even rejected compensation for units whose serial number has literally burned off.

to buy fire-prone Products, nor did it agree to assume losses when those Products fail and/or are voluntarily recalled by NWT.

32.     Beyond the terms of the Agreement, Danby had a right to expect that the products sold would be free of defects and consistent with reasonable standards of workmanship and quality.   See 13 Pa.C.S.A. § 2-314(b)(3); see also Gall by Gall v. Allegheny County Health Department, 555 A.2d 786, 789 (Pa. 1989) (merchantability requires that goods have an inherent soundness which makes them suitable for the purpose for which they are designed, that they be free from significant defects, and that they perform in the way that goods of that kind should perform.)

33.     By placing its products into the stream of commerce, and deliberately taking advantage of the U.S. consumer marketplace, NWT warranted and was obligated to meet certain minimum standards of quality and workmanship.

34.     NWT represents itself as *largest supplier of dehumidifier units in the United States* with a "renowned reputation" whose main business is the manufacture of air conditioners and dehumidifiers.  See information contained at http://www.newwidetech.com/en/about_history.php, which expressly states that as of 2016, NWT "has become the benchmark for portable air conditioners (PACs) and dehumidifiers in the global market."

35.     Unfortunately, NWT dehumidifiers, including but not limited to those sold to Danby under the Agreement, were defective and contained defects in quality and performance rendering them unsafe and unfit to remain in the hands, homes and businesses of U.S. consumers which required, in NWT's judgment, that the dehumidifiers be recalled.  See Exhibit "B."

36.     NWT set in motion a recall of its unreasonably dangerous and/or defective and/or unworkmanlike products, coining this recall "voluntary," yet has failed to recognize or make Danby whole for the losses it has and will sustain as a result of both (1) the sale and distribution of defective and/or unworkmanlike products and (2) pursuing a recall which by design results in substantial losses and reputational harm to Danby.

37.     NWT's proposed recall methodology – asking customers of varied levels of sophistication, education and acumen to (1) cut and remove certain electrical wires and a specification sticker off of the defective NWT machinery, (2) take photographs of the unit to show it has been rendered inoperable, (3) provide proof of the date of manufacturing and (4) proof of NWT having actually manufactured the machinery and (5) send these proofs and materials to a specific address – assures that customers[5] will be confused, annoyed and/or otherwise motivated or compelled to return those units in the most efficient manner to *them*: return the machinery to the store where the customer bought the item, or send them to Danby.

38.     NWT is well aware that its defective products will prominently display the name of the product as it is branded in the United States, e.g., Danby.

39.     This will necessarily result in NWT's branding/distribution partners, of which Danby is one, actually incurring the most significant recall costs, because Danby and the large retailers which sold NWT's defective products will actually receive the covered units, and then be obligated to refund, directly, retail customers and then have to follow the labor intensive protocol of documenting and supplying NWT (or its recall administrator) voluminous documentation in support of any offered reimbursement.  Danby is expected to realize millions of dollars in costs and expenses to both absorb retailer returns, as well as process thousands of direct returns to Danby by customers.

---

[5] NWT refers to its U.S. customer base as its "clients."

40.     Upon information and belief NWT's goal and intent, or at best, the direct result of its recall, is mitigating its own costs while Danby incurs direct costs, expenses and losses including but not limited to being back-charged by the retailers and incurs costs of retrieval, transport, storage and disposal of the recalled defective NWT items and communicating with customers impacted by the recalled NWT products.

41.     NWT is well aware that it sold defective products for retail sale through large retailers such as Costco and Menard's.

42.     Upon information and belief, NWT distributed to the U.S. market 203,481 products sold through and by Costco alone, with approximately 29,500 having been returned by customers to Costco by December 2021.

43.     Thus, as of December 2021, there still existed as many as 174,030 units sold to Costco and subject to the recall, but not yet having been returned.

44.     NWT purposefully and for its own financial gain and profit designed, manufactured, packaged, marketed, sold and directed its admittedly defective and fire-prone products into the U.S. retail marketplace.

45.     Now, after selling U.S. customers defective products, and duping large retailers and distributors like Costco, Menard's and Danby, NWT evades and ignores the damage done by its actions and the losses incurred, resulting in substantial damages incurred by Danby, including but not limited to reputational harm, business interruption, legal fees and expenses, back-charges and demands by retailers, and logistics/transportation/operational costs as a direct result of NWT's sale of defective products and NWT's manner of recalling its products.

II.     **JURISDICTION AND PARTIES**

46.     Pursuant to 28 U.S.C. §1332, this Court has diversity jurisdiction as the citizenship of the parties is diverse, and the amount in controversy is in excess of $75,000.

47.     Danby is a distributor of consumer appliances throughout North America, including Pennsylvania.

48.     Danby maintains a corporate office located at 1800 Production Drive, Findlay, Ohio 45840.

49.     NWT is a manufacturer and seller of consumer appliances throughout the world, including the United States and Canada, which, upon information and belief, maintains headquarters at No. 8F-8, Shin Min St. Chung Ho City, Taipei County, Taiwan.

50.     NWT regularly conducts and transacts business in the Commonwealth of Pennsylvania, and specifically in the counties comprising the territory within the United States District Court of the Eastern District of Pennsylvania, deriving substantial economic profits for such business including but not limited to manufacture, design and distribution of products and components within the Commonwealth and Eastern District of Pennsylvania.

51.     NWT maintains continuous and systematic contacts with Pennsylvania, particularly through its relationships with distributors, such as Danby, who sell and service NWT's products in Pennsylvania.

52.     NWT has purposely availed itself of the opportunities and attendant benefits of its business operations in Pennsylvania.

53.     NWT has appointed, approved, designated and relied upon third party representatives, including legal counsel and insurance administrators, in Pennsylvania and with respect to legal actions pending in Pennsylvania.

54.     This Court has both personal and subject matter jurisdiction over the Defendants, and the venue of this matter is proper.[6]

---

[6] NWT is currently a Defendant in a civil lawsuit arising out of claimed products liability where it is alleged that a dehumidifying unit malfunctioned and caused extensive property damages.  In that suit, filed in the

**COUNT I**

55.     Danby incorporates by reference the allegations contained in paragraphs 1 through 55 of the Complaint as if set forth fully at length herein.

56.     As set forth below, NWT, individually and collectively, by and through their owners, representatives, agents, principals and/or employees, have breached the terms of the applicable Agreement, resulting in real monetary damages to Danby for which recovery is sought in this civil action.

57.     NWT has failed to fulfil the promises and its obligations under the Agreement.

58.     As an inducement to enter into the Agreement, NWT supplied Danby with samples of certain models of dehumidifiers as representative of the expected performance of the Products.

59.     NWT did not identify or acknowledge that its dehumidifiers were prone to overheating and ultimately ignition.

60.     Danby has sustained and will continue to sustain damages as a result of NWT's breach of contractual terms and conditions of the Agreement.

61.     NWT's actions and omissions, as described above, constitute a breach of the covenants of the Agreement.

62.     Specifically, NWT warranted that NWT would "reimburse Danby . . . for Danby's expenses for any costs, including but not limited to, labour and materials, incurred as a result of any such failures."  See Exhibit "A," ¶ 6.

---

United States District Court for the District of Connecticut, NWT admitted appropriate personal jurisdiction based upon the sufficient contacts in Connecticut through the sale of dehumidifiers in Connecticut.  Upon information and belief, the dehumidifying unit involved in this suit was a Danby model.  Accordingly, the admission by NWT in this suit docketed at 3:20-cv-00546-MPS, supports jurisdiction in the present civil action.

63.     Moreover, NWT understood that each of the units supplied under the Agreement were obligated as follows:

4.    It shall be the responsibility of New Widetech to obtain and retain ownership of Canadian Standards Association (C.S.A.) or Underwriters Laboratories (U.L.) safety certification for all the Products shipped to Danby under this agreement, and all the Products shall bear the c-C.S.A.-us or c-U.L.-us listed approval marking to certify the Products are approved for distribution anywhere in the North American market.  It shall also be the responsibility of New Widetech to provide a copy of the Canadian Standards Association or Underwriters Laboratories safety certification report to Danby before the initial shipping date of the Products.  All New Widetech Products supplied to Danby under this Agreement must be c-C.S.A.-us or c-U.L.-us listed approved and fully compliant with all Department of Energy (D.O.E.) and Federal Trade Commission (F.T.C) legislation and regulations at time of shipment.  This shall also include all appropriate labeling requirements.   New Widetech will defend, indemnify and save Danby harmless from all costs, including; attorney fees, claims and expenses in the event the Product supplied does not meet such requirements, and this obligation will survive the expiration or termination of this Agreement.

See Exhibit "A," ¶ 4.

64.     Further, NWT specifically agreed to indemnify and saved harmless Danby in any and all claims relative to product liability pertaining to the Products supplied.

65.     Accordingly, Danby is entitled to damages, including all incidental and consequential damages resulting from the recall, for which damages now exceed $150,000, and are expected to continue to rise as the recall persists, exclusive of interest and costs, but which have not yet been fully determined.  Such damages include, without limitation, the cost price of each unit returned pursuant to the recall, together with all landed costs (including, but not limited to, custom duties and similar charges incurred by Danby), shipping and transportation costs, expenses incurred in connection with the recall, reimbursement of shipping and handling charges, lost profits, attorneys' fees and expenses, and costs of care and custody of any/all recalled units.

WHEREFORE, Plaintiff, Danby Products, Inc. demands judgment in its favor and against Defendant, New Widetech Industries Co., Ltd., (a) awarding damages, including all

incidental and consequential damages to Danby in an amount in excess of $150,000 and to be further determined at trial arising from the recall of NWT dehumidifiers; (b) awarding reasonable attorneys' fees and expenses; (c) awarding costs and such prejudgment interest as allowed by law; and (d) granting all such other relief as the Court may deem appropriate.

## COUNT II

66.     Danby incorporates by reference the allegations contained in paragraphs 1 through 66 of the Complaint as if set forth fully at length herein.

67.     At the time Danby entered into the Agreement, as well as at all times material to the distribution of the various products manufactured by NWT, that are now subject to numerous product defect claims, such products contained an implied warranty of merchantability that the product was free of defects and an implied warranty that the products were fit for the intended use thereof.

68.     Further, NWT expressly warranted that every product shipped pursuant to the Agreement would satisfy requirements imposed by either the Canadian Standards Association (C.S.A.) or Underwriters Laboratories (U.L.), and would be approved and fully compliant with all legislation and regulations imposed by the Department of Energy and Federal Trade Commission.

69.     NWT has further warranted that it was a quality manufacturer engaged in the manufacture of dehumidifiers for over 30 years.

70.     NWT is therefore a merchant of dehumidifiers for sale and use by consumers in households throughout the United States.

23319558v1

71.     Danby is a distributor of dehumidifiers throughout the United States, by virtue of its relationship with large retailers (e.g. Costco, Menards, etc.), a fact well known and understood by NWT and which profited NWT.

72.     NWT breached the warranty of merchantability by impliedly (and expressly) warranting that its dehumidifiers were free of defects, of merchantable quality and fit for their intended and ordinary purpose (used by consumers for dehumidifying purposes), when, in fact, they were not due to the widespread overheating occurrences.

73.     NWT is in violation of 13 Pa.C.S.A. §§ 2314 (implied warranty of merchantability) and 2315 (implied warranty of fitness for particular purpose) for selling dehumidifiers that were defective and prone to overheating and ignition.

74.     Danby reasonably relied upon NWT's skill and judgment as to whether the dehumidifiers were of merchantable quality and fit for the intended and ordinary purpose.

75.     NWT breached the implied warranty of fitness for a particular purpose by acquiring, processing, marketing, selling and distributing an unreasonably dangerous product (e.g. manufacturing and selling dehumidifiers that was prone to ignition of fires placing consumers at risk for burns or other fire hazards) to Danby as being safe when NWT knew or had reason to know that the dehumidifiers were not safe, or that NWT should have discovered such defect(s) prior to the sale and distribution to Danby, and ultimately that the dehumidifiers would be distributed and sold for consumer use as intended.

76.     NWT had reason to know that Danby was relying upon NWT to furnish suitable, safe, and industry compliant goods.

77.     NWT has not disclaimed any implied warranty.

23319558v1

WHEREFORE, Plaintiff, Danby Products, Inc. demands judgment in its favor and against Defendant, New Widetech Industries Co., Ltd., (a) awarding damages, including all incidental and consequential damages to Danby in an amount in excess of $150,000 and to be further determined at trial arising from the recall of NWT dehumidifiers; (b) awarding reasonable attorneys' fees and expenses; (c) awarding costs and such prejudgment interest as allowed by law; and (d) granting all such other relief as the Court may deem appropriate.

## **COUNT III**

78.     Danby incorporates by reference the allegations contained in paragraphs 1 through 78 of the Complaint as if set forth fully at length herein.

79.     Between the years of 2009 through 2016, Danby purchased nearly 1 million dehumidifying units from NWT, providing NWT gross sales in excess of **$100 million** U.S.

80.     To be sure, NWT received and appreciated a financial benefit of its distribution arrangement with Danby.  In fact, over this same time period, NWT appears to have achieved market dominance, holding itself out in 2016 as the "market leader of the global market" for dehumidifiers.  See http://www.newwidetech.com/en/about_history.php.

81.     Despite having knowledge thereof, or sufficient reason to know that the dehumidifiers sold to Danby contained a defect, thereby rendering such units valueless and unfit for use, NWT continued to promote these products in order to sustain and/or grow NWT's business.

82.     NWT has been unjustly enriched through its failure to fulfill its obligations under the Agreement including by, in relevant part, selling Danby defective and fire-prone products masked as products safe for consumer use, thereby extracting payment from Danby for products

which have no market value and in fact are unsafe to be left on the market and warrant disposal and incarnation by NWT's own admission.

83.     NWT's unjust enrichment continues as it avoids its obligations to defend, indemnify and protect Danby from losses and expenses due to alleged defects contained in NWT's products and by failing to appropriately protect its customer, Danby, from unnecessary losses, costs and burdens in violation of the Agreement.

84.     NWT has been unjustly enriched through inaction and failing to live up to its agreed-upon contractual and legal duties, and improperly avoiding, delaying, refusing or outright ignoring its obligations to its customer, Danby.

85.     By failing to indemnify and hold harmless Danby for all incidental, consequential, and other damages that stem directly from NWT's voluntary recall, imposing unilateral terms for the return, refund or reimbursement of consumers, NWT has experienced a significant financial benefit and has been unjustly enriched by its own conduct, to the detriment of Danby.

86.     NWT has effectively duped large retailers into paying for reliable Products that are in fact worthless, and thus far skirted the substantial costs and financial fallout from those same defective Products being recalled.

87.     Permitting NWT to retain more than $100 million in monies paid for viable and non-defective products, while actually delivering defective and now useless dehumidifiers to Danby for distribution and sale throughout the United States to consumers, and then unilaterally conducting a recall while refusing to indemnify or provide fair and just compensation to Danby, would be unjust at law.

WHEREFORE, Plaintiff, Danby Products, Inc. demands judgment in its favor and against Defendant, New Widetech Industries Co., Ltd., (a) awarding damages, including all incidental and consequential damages to Danby in an amount in excess of $150,000 and to be further determined at trial arising from the recall of NWT dehumidifiers; (b) awarding reasonable attorneys' fees and expenses; (c) awarding costs and such prejudgment interest as allowed by law; and (d) granting all such other relief as the Court may deem appropriate.

## COUNT IV

88.     Danby incorporates by reference the allegations contained in paragraphs 1 through 88 of the Complaint as if set forth fully at length herein.

89.     At all times material to this claim, Danby maintained contractual relationship with large nationwide retailers such as Menards and Costco, of which NWT was aware and materially benefited.

90.     Danby was obligated to supply such large nationwide retailers with dehumidifiers that were free from defect.

91.     To the extent defects existed, Danby was obligated to fully refund the price paid by the consumer to the large retailers, which is believed to have ultimately been passed on to the consumer.

92.     NWT knew or had reason to know that the existence of any defect in the product would impose upon Danby a significant financial penalty.

93.     By instituting the voluntary recall whose roll out relied upon unilaterally developed terms for the disposal, return, and refund of units, without the participation of Danby, NWT has, or will, interfere with the contractual relations between Danby and its large retailers in the United States.

94.     Specifically, NWT's presumed knowledge that consumers who purchased dehumidifiers from large retailers with whom Danby had distribution relationships with were going to return the recalled units directly to the retailer despite any recall program directions. As a result, NWT doubly benefited from the Danby relationship.  First, by utilizing the distribution channel for the sale of nearly 1 million dehumidifying units in the United States, and secondly in knowing that the majority of returns would be made directly to the retailer, force Danby to assume the losses connected to fully refunding the consumer the total purchase price of the dehumidifier.  Thereafter, as a result of Danby's relationship with these large retailers, it became Danby's responsibility, per the unilateral recall program, to transport, store, inspect, dismantle and submit claims for recall reimbursement, or risk termination of the business relationship with these large retailers.

95.     Further, in order to mitigate its damages/expenses in having to fully reimburse the large retailer, and preserve its customer relationship, Danby would have to arrange for the transportation, storage, inspection, dismantlement, documentation, submission, and other actions that are required in order to obtain any recompense at all from NWT.

96.     The existence of defects, the institution of the voluntary recall under terms unilaterally designed by NWT, and the refusal to reimburse Danby for all of the costs associated with performing the noted acts above, necessarily threatens the ongoing contractual relationship between Danby and large retailers.

97.     NWT's conduct demonstrates bad faith and by design negatively impacts Danby's relationships with large retailers.

98.     At a minimum, Danby has suffered harm in the difference between the fully refunded sums offered by large retailers, the contractual obligation by Danby to refund the full

costs of each unit to the large retailer, and the prorated amounts being offered by NWT as a consumer refund.

99.     Additionally, Danby has incurred the substantial costs, labor expenses, reputational harm and damage to its business relationship in an amount to be calculated by the finder of fact.

WHEREFORE, Plaintiff, Danby Products, Inc. demands judgment in its favor and against Defendant, New Widetech Industries Co., Ltd., (a) awarding damages, including all incidental and consequential damages to Danby in an amount in excess of $150,000 and to be further determined at trial arising from the recall of NWT dehumidifiers; (b) awarding reasonable attorneys' fees and expenses; (c) awarding costs and such prejudgment interest as allowed by law; and (d) granting all such other relief as the Court may deem appropriate.

## **COUNT V**

100.     Danby incorporates by reference the allegations contained in paragraphs 1 through 100 of the Complaint as if set forth fully at length herein.

101.     An actual, existing, and continuing controversy within the scope and meaning of 28 U.S.C. § 2201 *et seq.* exists between Danby and NWT as a result of NWT's respective denials that it has any obligation to indemnify and hold Plaintiff harmless for all damages, costs and expenses (including, but not limited to, the costs and expenses resulting from the recall of the dehumidifiers) arising from NWT's conduct as described above.

102.     The aforesaid controversy is a substantial controversy between adverse legal interests of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

103.     The amount in controversy exceeds the sum of $150,000.

104.     Danby's interest in the above-described controversy is direct, substantial and present.

105.     Danby is entitled under 28 U.S.C. § 2201, *et seq*. to a judicial determination, declaration and adjudication that (a) the recalled dehumidifiers failed to satisfy (i) applicable implied warranties under law; (ii) the express warranties, representations and covenants inducing and set forth in the Agreement; (iii) U.L. safety standards as required by the Agreement; (b) NWT breached and continues to breach the Agreement; (c) the dehumidifiers are properly determined to be defective; (d) NWT has an obligation to indemnify and hold Danby harmless for all damages, costs and expenses (including, but not limited to, the damages, costs and expenses incurred in connection with the recall) arising from the aforesaid breaches and applicable law.

106.     Declaratory judgment to determine the parties' respective rights and interests is an appropriate remedy under the circumstances.

107.     As a result of NWT's breaches under the Agreement, and at law, Danby has incurred, and will incur in the future, damages far in excess of the statutorily provided threshold of $150,000 (including, but not limited to, damages for the cost price of the dehumidifiers as paid by Danby, together with all landed costs (including, but not limited to, custom duties and similar charges incurred by Danby) and shipping and transportation costs, expenses incurred in connect with the recall, lost profits, attorneys' fees and expenses, and costs of care and custody) in consequence of NWT's voluntarily and unilaterally imposed terms of the recall.

WHEREFORE, Plaintiff, Danby Products, Inc., demands entry of a declaratory judgment in its favor and against Defendant New Widetech Industries Co., Ltd. (a) that the subject dehumidifiers fail to satisfy the implied warranties under Pennsylvania law, the express

warranties, representations and covenants set forth in and intended to induce the Agreement; (b) that NWT is in breach of the Agreement for supplying defective and non-compliant dehumidifiers; (c) that NWT is obligated to indemnify and hold Danby harmless for all damages, costs and expenses (including, but not limited to, the damages, costs and expenses incurred in connection with the recall) arising from the aforesaid breaches; (d) reasonable attorneys' fees and costs; and (f) granting such other relief as the Court deems just and proper.

## COUNT VI (DAMAGES)

108.    Danby incorporates by reference the allegations contained in paragraphs 1 through 108 of the Complaint as if set forth fully at length herein.

109.    Danby has suffered monetary damages as a direct result and consequence of NWT's actions and omissions, as they pertain to the design, sale, distribution, and recall of the defective dehumidifiers.

110.    Danby has also suffered damages in the form of reputational damage which may be demonstrated in the form of lost profits or other evidence.

111.    Consequential damages as follows:

- Reimbursement of large retailers for the full cost of the defective product;

- Reputational harm;

- Lost profits arising from the tarnishing nature of being identified in conjunction with a widespread product recall and hundreds of known fire events;

112.    Incidental damages as follows:

- Advertising costs associated with the recall;

- Transportation costs of units returned to Danby by consumers directly, or through large retailers;

- Storage costs of units returned to Danby by consumers directly, or through large retailers;

- Labor costs associated with Danby's transportation, unpacking, inspection/examining, destruction, photographing, recording/documenting, and submission to NWT of returned units;

- Costs of disposal/recycling of returned units;

- Attorneys' fees and costs;

- Prejudgment interest;

- Any other costs deemed incidental to Danby's participation in the recall per the terms unilaterally imposed by NWT

WHEREFORE, Plaintiff, Danby Products, Inc. demands judgment in its favor and against Defendant, New Widetech Industries Co., Ltd., (a) awarding damages, including all incidental and consequential damages to Danby in an amount in excess of $150,000 and to be further determined at trial arising from the recall of NWT dehumidifiers; (b) awarding reasonable attorneys' fees and expenses; (c) awarding costs and such prejudgment interest as allowed by law; and (d) granting all such other relief as the Court may deem appropriate.

Respectfully submitted:

Dated:  January 13, 2022

**POST & SCHELL, P.C.**

By:   **/S/ ROBERT J. BALCH**

ROBERT J. BALCH, ESQUIRE
ATTY ID No.:  202990
IAN T. BAXTER, ESQUIRE
ATTY ID. No.: 314981
Tower 6
600 Hamilton Street
Suite 200
Allentown, PA 18101-2105
(610) 774-0317
FAX (484) 375-0233
rbalch@postschell.com
ibaxter@postschell.com

Attorneys for Plaintiff,
Danby Products, Inc.